IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF THE SEARCH OF
A TCL CELLULAR TELEPHONE, GRAY
IN COLOR, CURRENTLY LOCATED AT
THE ATF FIELD OFFICE IN
CHARLESTON, WV.

Case No. 2:24-mj-00137

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kachine Jonese, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION

**1.** I seek this search warrant to locate evidence of a crime occurring at Roy's Loans & Sporting Goods, a federal firearms licensee. Roy's Loans & Sporting Goods is in Oak Hill, Fayette County, West Virginia. In the early morning hours on July 4, 2024, a person broke into the business and stole several firearms. That same person appeared to enter the business on two other occasions within a 24-hour period. One or more co-conspirators assisted on the third occasion, and a total of 33 firearms and other items were stolen from the business. The identification of various suspects led to the seizure of the subject phone believed the property of Andrew GUNN (hereinafter "GUNN"). It is the contents of the subject phone agents seek to search.

1

**2.** I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since June 2021. I am currently assigned to the ATF Louisville Field Division, Charleston, West Virginia, Field Office.

**3.** I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a gray in color TCL cellular telephone, more fully described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

**4.** The contents of Attachment A and Attachment B to this Affidavit and application for a search warrant are incorporated herein by reference.

**5.** The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

**6.** Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

## STATUTORY AUTHORITY

**7.** This investigation concerns alleged violations of 18 U.S.C. § 922(u) – Theft of Firearm from FFL; 18 U.S.C. § 922(g)(1) –

2

Felon in Possession of a Firearm; and 18 U.S.C. § 371 – Conspiracy.

## AFFIANT'S TRAINING AND EXPERIENCE

**8.** Your Affiant is currently employed as a Special Agent with the ATF.

**9.** Your Affiant graduated from the Federal Law Enforcement Training Center, where I learned basic criminal investigation techniques. In addition, I graduated from the ATF National Academy, where I learned about federal firearms laws, federal explosives laws, bomb scene investigations, and arson investigations.

**10.** Your Affiant has received investigative training, conducted and participated in investigations of violations of federal criminal laws, including those relating to firearms and controlled substances. These acts commonly involve the criminal use and transfer of firearms, illicit drug trafficking, acts of arson, criminal possession or use of explosives, and/or destructive devices.

**11.** In my current position as an ATF Special Agent assigned to the Charleston, West Virginia, Field Office, my primary responsibilities include investigating individuals or groups who have committed violations of the federal firearms and narcotics laws. Within that role, my job duties include, but are not limited to:

3

a. Functions as a case agent that entails the supervision of specific investigations;

b. Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts;

c. Functioning as a surveillance agent observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms; and

d. Drafting, obtaining, and executing search warrants.

## AFFIANT'S KNOWLEDGE OF CELLULAR TELEPHONES AND THEIR USE IN CRIMINAL ACTIVITY

12. Your Affiant is familiar with cellular telephones or mobile telephones.

13. I know that a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communications between parties in remote locations.

14. I am aware that cellular telephones usually include a "call log," which records the telephone number, date, and time of calls made to and from the phone.

15. In addition to enabling voice communications, I know that cellular telephones now offer a broad range of functions, which include, but are not limited to: storing names and phone numbers in electronic address books or contact lists; sending, receiving,

4

and storing text messages and email; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the internet; and sending, receiving, and storing GPS coordinates of a phone's location.

**16.** Based on my knowledge, training, and experience, I know that cellular phones, such as the TCL cellular telephone described in Attachment A can store electronic information for long periods of time.

**17.** In my experience, it is common for cellular telephones possessed by individuals who illegally possess firearms and conspire with others to commit crimes, to contain evidence including call logs, text messages, stored emails, contact lists, photographs and video images of firearms, firearm proceeds, and other information. It is also common for individuals to utilize cellular telephones to sell firearms.

**18.** I also know from my training and experience that the electronic memories of cellular telephones, including social media applications, have been found to contain evidence of illegal firearm possession, including communications regarding when and how an illegal firearm was obtained, who obtained the illegal firearm for the possessor, and the motivation for possessing the illegal firearm. Generally, historical data regarding the prior

possession of firearms, including voice messages, text messages and contact information will be stored in the cellular telephone.

**19.** I also know that people who illegally sell or possess firearms frequently take, or cause to be taken, photographs or other images of themselves in possession of firearms, their associates, their property, and assets with cellular telephones. They also frequently utilize cellular telephones to communicate with others they have conspired with as well as with other individuals in order to purchase or sell firearms.

**20.** Cellular telephone capabilities sometimes include Global Positioning Systems (GPS), which calculates the device's geographical location by receiving information from GPS satellites. This includes GPS data associated with metadata in photograph and video files and databases from applications that use GPS data in their operation. This location information can also come from cellular towers and wi-fi networks with which the device has interacted. The records obtained from wireless network connections could give clues to a device's historical locations. By determining the physical location associated with the cell phone, investigators can understand the chronological and geographic context of the cellular telephone and use relating to the crimes under investigation. Such information allows investigators to understand the geographic and chronological

context of cellular telephones access, use, and events relating to the crimes under investigation.

**PROBABLE CAUSE**

**21.** On July 5, 2024, officers with Oak Hill Police Department (OHPD) responded to a breaking and entering that was reported at Federal Firearms Licensee (FFL) Roy's Loans & Sporting Goods located at 121 Central Avenue, Oak Hill, West Virginia 25901. The point of entry appeared to be the back door to the business. The back door faced an alleyway behind the FFL and contained a shattered window. OHPD learned that several firearms were stolen from the FFL. Responding investigators from OHPD took photos of the scene and collected potential fingerprint evidence.

**22.** On July 5, 2024, ATF Special Agents Kachine Jonese and Sean McNees responded to Roy's Loans & Sporting Goods in reference to firearms and other property that had been stolen from the FFL. Once there, Agents spoke with Jerry Snuffer, licensee of the FFL. Snuffer advised that he had a surveillance video camera system inside of the FFL that captured the firearm theft. Snuffer reviewed the video and advised that he observed two individuals inside of the FFL who committed the theft. Snuffer stated the business closed as usual on July 3, 2024, at approximately 5:00 p.m. The FFL remained closed on July 4, 2024, for the holiday. Snuffer returned on the morning of July 5, 2024, and observed that several items, to include firearms, had been stolen. It was initially reported

that 40 firearms had been stolen from the FFL, but a final and complete inventory confirmed that 33 firearms had been stolen.

**23**. Agents obtained a copy of the recorded store surveillance video from Snuffer. A review of surveillance footage from inside the FFL showed that the time depicted on the video was approximately one hour and forty-four (1:44) minutes ahead of the actual time. The video showed the following:

**A)** At approximately 1:01 a.m. actual time (time on the video 2:45 a.m.) on July 4, 2024, an individual that appeared to be a black male of medium build (Suspect #1) entered the main area of the FFL. Suspect #1 entered from a door that led into the area of the business that was no longer in active use and appeared to be used mainly as a storage area. Suspect #1 wore a black jacket with a hood pulled over his head, black pants, and dark colored shoes with white soles. Further, Suspect #1 wore a black mask that partially covered his face, and Suspect #1 was carrying what appeared to be a gray backpack. Suspect #1 was not wearing gloves. Suspect #1 went to two different display cases containing handguns and placed firearms from both display cases into his backpack. At approximately 1:02 a.m. actual time (time on the video 2:46 a.m.), Suspect #1 left through the same door from which he entered the FFL.

**B)** At approximately 5:24 p.m. actual time (time on the video 7:08 p.m.) on July 4, 2024, an individual that appeared to be

Suspect #1 entered the FFL from the same door noted above. Suspect #1 went back to the same two display cases and removed more firearms. Suspect #1 placed the firearms into what appeared to be the same gray backpack described above. Suspect #1 appeared to be wearing different shoes that did not have a white sole. Red/pink clothing could also be observed underneath the black jacket the suspect was wearing. Suspect #1 was only inside of the FFL for approximately one minute before exiting through the same door from which he entered the business.

C) At approximately 11:18 p.m. actual time on July 4, 2024 (time on the video 1:02 a.m. on 7/05/2024), two individuals entered the FFL from the same door as observed on the previous two occasions noted above. One suspect appeared to be Suspect #1, but Suspect #1 now wore a black t-shirt, red mask covering his head and face, and black pants. Suspect #1 appeared to wear only white socks on his feet - no shoes. Also, Suspect #1 now had a different backpack that was blue and gray in color.

The second suspect appeared to be a black male of medium build (Suspect #2). Suspect #2 was wearing a dark colored long sleeve shirt and dark colored pants. Suspect #2 also wore a blue mask and a multicolored hat that appeared to be yellow and green in color. Suspect #2 had on light colored, possibly

9

gray shoes, and Suspect #2 carried a bag that appeared to be green in color. Suspect #2 did not appear to wear gloves, but Suspect #2 utilized his shirt sleeves to cover his hands.

Surveillance video showed both suspects at the same two display cases described in subparagraphs A and B above. Both suspects appeared to be taking firearms and placing them in the bags that each carried into the FFL. Suspect #2 then turned around and went to a wall that had firearm ammunition on display. Suspect #2 appeared to take something from this area and put it in the bag that he possessed.

Surveillance video showed Suspect #1 going to a different display case that contained various collector coins and like items. Suspect #1 appeared to take multiple items from this case and place them into the bag. At approximately 11:20 p.m. actual time on July 4, 2024 (time on the video 1:04 a.m. on 07/05/2024), both suspects exited the FFL through the same door from which they entered FFL.

**24.** On July 5, 2024, as Agents conducted their investigation inside the FFL, an individual who later became a cooperating witness (CW) came into the FFL and provided information to Agents. The CW told Agents he/she was in a place known as "hell holler" with his/her partner. While in "hell holler", someone told him/her that two black males broke into the FFL. The CW stated that the black males,

10

believed to be Suspect #1 and Suspect #2, were currently staying in "hell holler" at the end of Crawford Street. A camper was also located on the same property.

**25.** The CW was shown a map and identified 379 Crawford Street, Oak Hill, West Virginia 25901 as the location at the end of Crawford Street in "hell holler". The CW stated he/she witnessed the two black males, believed to be Suspect #1 and Suspect #2, selling firearms to multiple individuals at the location the previous night. One of the black males was wearing a "black shirt, black slim pants and red underwear." The CW further stated that he/she obtained one of the stolen firearms from an individual that he/she knew as "John Boy" at this location. The CW still had the firearm and turned over the stolen firearm to SA McNees. Agents confirmed the firearm was one of 33 stolen from the FFL.

**26.** On July 6, 2024, a state search warrant was executed at 379 Crawford Street, Oak Hill, West Virginia 25901. Andrew GUNN (hereinafter "GUNN") was located in the camper situated on the property and was in possession of one of the stolen firearms from the FFL. He also possessed some firearm ammunition stolen from the FFL. Investigators advised GUNN of his Miranda rights verbally on scene, and GUNN indicated that he understood his rights. Then, GUNN provided agents an interview. In the recorded interview, GUNN advised that Jawuan WATTS (hereinafter "WATTS") and another individual named "John Boy" stole the firearms from the FFL. "John

11

Boy" was later identified as John HUDSON (hereinafter "HUDSON"). GUNN also stated that WATTS was currently out trying to sell some of the stolen firearms. At the scene of the search, Agents seized the subject cellular telephone. The subject cellular telephone, believed to belong to GUNN, was located on the ground immediately in front of the steps leading to the camper door.

27. While investigators were continuing their search of the residence, OHPD Det. Dodrill received information from OHPD Cpl. Tomlin that a black male with a backpack riding a bicycle, matching WATTS' description, was approaching the Crawford Street residence from a wooded area behind the residence. Investigators previously received information that individuals in possession of firearms related to the investigation were seen coming through this same area and going to 379 Crawford Street.

28. After receiving information from GUNN that WATTS was out attempting to sell one or more of the stolen firearms, investigators located and temporarily detained WATTS as he approached 379 Crawford Street. WATTS had a cellular telephone in his possession along with a backpack. The backpack appeared to be the same backpack that Suspect #1 carried inside the FFL during the theft of firearms on July 4, 2024. Investigators attempted to interview WATTS on site, but WATTS requested a lawyer after he was verbally advised of his Miranda rights. Having no further basis for detention, investigators released WATTS from the scene.

However, investigators seized WATTS' backpack and his cellular telephone because they received information that WATTS was the person who committed the theft, that WATTS was out attempting to sell one or more of the stolen firearms just prior to his detention, and the backpack he carried matched the backpack carried by Suspect #1 during the breaking and entering of the FFL. Agents also knew that the cellular telephone seized from WATTS likely contained location information and could contain information (in message form or otherwise) relating to the sale of the stolen firearms. Further, Agents seized the phone to prevent the destruction of any such evidence related to the crime(s).

**29.** After concluding the search warrant at 379 Crawford Street, Agents continued to canvass the area and conducted knock and talks in search of the stolen firearms. Agents located and interviewed HUDSON who stated he purchased one of the stolen firearms from WATTS. HUDSON further admitted he had gone with WATTS to the FFL but never went inside. HUDSON stated they went to the back of the FFL where he observed a window in the back door had been broken. HUDSON said WATTS told him he had already been to the FFL on two other occasions. WATTS told HUDSON to stand by the door and let him know if anyone came to the area. WATTS exited the FFL with a gray backpack, and HUDSON observed there were several firearms in the bag.

**30.** On July 12, 2024, Agents were at OHPD conducting follow up investigation. While there, they learned that WATTS was in custody for state charges out of West Virginia and unrelated to the FFL theft. While present at OHPD, WATTS advised that he wanted to speak to Agents. Agents conducted a recorded interview with WATTS. During the recorded interview, WATTS advised that he had previously requested an attorney, but now WATTS wanted to speak with Agents about the FFL breaking and entering without an attorney. Agents verbally advised WATTS of his Miranda rights. WATTS stated that he understood his rights. During the interview, WATTS admitted to Agents that he broke into the FFL and stole firearms and coins. He stated he went into the FFL on two occasions on July 4, 2024. After doing so, he went back to the Crawford Street address where he was staying, gave the firearms to someone, and that individual later returned with some money and narcotics. WATTS also confirmed he had a prior felony conviction and acknowledged that he knew that he was not allowed to possess firearms. WATTS denied that he was in possession of a cellular telephone when he committed the theft.

**31.** WATTS identified Suspect #2 on the surveillance footage, wearing a blue mask and multi-colored hat, as GUNN. WATTS stated GUNN stayed in the camper located at the Crawford Street address.

**32.** On July 19, 2024, investigators went back to 379 Crawford Street, Oak Hill, WV 25901 to locate GUNN and see if he would be willing to answer additional questions. SA McNees and SA Jonese

14

approached the camper GUNN was known to stay in and observed that GUNN was standing in the camper. SA McNees and SA Jonese each had ATF issued badges displayed as they approached GUNN. SA McNees then asked to speak with GUNN, and he stepped outside from the camper.

**33.** GUNN was patted down for weapons by SA McNees. Agents reminded GUNN that he had previously been advised of his rights. Thereafter, GUNN engaged SA McNees in conversation about where some of the stolen firearms could be located. GUNN was not placed in handcuffs during the conversation. SA Jonese then activated a recording device. SA McNees explained to GUNN that he was not under arrest or detained and SA McNees was interested in his cooperation. GUNN indicated that he understood.

**34.** At first, GUNN denied that he had gone inside of the FFL during the theft. When questioned further on the topic, GUNN confessed that he had gone into the FFL. GUNN denied that he stole any firearms when he went inside, but he did admit that he stole some firearm ammunition and an Xbox. GUNN stated that WATTS had been the other person with him inside the FFL and GUNN knew that WATTS was "barefoot" when he went into the FFL.

**35.** GUNN advised that he and WATTS entered the FFL from the backside of the building after walking there on foot. GUNN could not recall what he and WATTS did with the clothing they wore during the theft. The hat GUNN wore belonged to WATTS.

36. GUNN provided consent to SA McNees and SA Jonese to search the camper. Also, GUNN gave consent to search the subject cellular telephone and provided the passcode. GUNN stated that there could possibly be a photograph of one of the stolen firearms on his phone.

## PRIOR FELONY CONVICTION

37. A review of GUNN's criminal history showed that he is prohibited from possessing firearms, having previously been convicted of the felony offense of delivery of a controlled substance in the Circuit Court of Fayette County, West Virginia, on or about January 10, 2018.

## CUSTODY OF THE CELLULAR TELEPHONE

38. The TCL cellular telephone described in Attachment A was seized by law enforcement during the interaction with GUNN that occurred on July 6, 2024. Since the cellular telephone was seized it has remained in the custody of the ATF Charleston, WV Field Office, 300 Summers Street, Charleston, WV 25301.

39. In my training and experience, I know that the cellular telephone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the cellular telephone first came into the possession of ATF.

## NATURE OF THE EXAMINATION

**40.** Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

**41.** Because this warrant seeks only permission to examine the device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

**42.** Based on my training and experience, and the facts set forth above, I believe there is probable cause that evidence of criminal violations of 18 U.S.C. § 922(u) - Theft of Firearm from FFL; 18 U.S.C. § 922(g)(1) - Felon in Possession of a Firearm; and 18 U.S.C. § 371- Conspiracy, will be found on the TCL Cellular Telephone described more completely in Attachment A.

**43.** WHEREFORE, your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of

the TCL Cellular Telephone described in Attachment A to seek the
items described in Attachment B.

Further your affiant sayeth naught.

SA _____

Kachine Jonese
Special Agent, ATF

Sworn to before me, and subscribed in my presence, this
16th day of August, 2024.

Dwane L. Tinsley
United States Magistrate Judge

18